```
             IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF OHIO
                       EASTERN DIVISION
```

Daniel Robert Rupert,              :

    Plaintiff,                 :

  v.                               :        Case No.  2:14-cv-1065

                                 :        JUDGE ALGENON L. MARBLEY
Commissioner of Social Security,            Magistrate Judge Kemp

    Defendant.                 :

                    REPORT AND RECOMMENDATION

                    I.   Introduction

    Plaintiff, Daniel Robert Rupert, filed this action seeking review of a decision of the Commissioner of Social Security denying his application for supplemental security income.  That application was filed on November 23, 2010, and alleged that Plaintiff became disabled on May 1, 2002.

    After initial administrative denials of his claim, Plaintiff was given a video hearing before an Administrative Law Judge on August 7, 2012, and a supplemental hearing before a different ALJ on January 14, 2013.  In a decision dated February 8, 2013, the ALJ denied benefits.  That became the Commissioner's final decision on June 6, 2014, when the Appeals Council denied review.

    After Plaintiff filed this case, the Commissioner filed the administrative record on October 22, 2014.  Plaintiff filed his statement of specific errors on December 24, 2014, to which the Commissioner responded on February 25, 2015.  Plaintiff filed a reply brief on March 16, 2015, and the case is now ready to decide.

    II.  The Lay Testimony at the Administrative Hearing

    Plaintiff, who was 24 years old at the time of the administrative hearings and who has a high school education with

some college, testified as follows.  His testimony appears at pages 32-41 and 57-74 of the administrative record.

At the first administrative hearing, Plaintiff testified that he was living in semi-supervised housing which was affiliated with Tri-County Mental Health Services.  He had been homeless before that.  His current housing had an aide who helped him with medication and other issues, and he did not believe he would be able to live on his own.  He described having thoughts of harming people, which he did his best to ignore or cope with.  They did intrude into his dreams, however.

Plaintiff said he had tried to work in the past, at a janitorial job, at a transitional job, and at McDonald's.  None of those jobs went well, primarily due to his inability to stay focused.  Even with medication, he still had that problem.  He also testified to mood swings, which were helped by medication but still occurred.

The second hearing took place after a consultative mental evaluation was ordered.  At that hearing, Plaintiff was asked about his mental health treatment, which included counseling every two weeks and seeing a psychiatrist every three to six months for medication.  He also described a typical day, which consisted of sitting at home reading and watching television occasionally.  He also used a computer when at the library.  He shopped with his caseworker, who also managed his budget.  Plaintiff did not socialize and did not like being around people.  He also had migraine headaches which he treated with ibuprofen.

### III.  The Medical Records

The medical records in this case are found beginning on page 327 of the administrative record.  The pertinent records can be summarized as follows.

Plaintiff was hospitalized for six days in August, 2003 after an episode involving his trying to choke himself.  He was

diagnosed with PTSD, ADD, and a mood disorder, and placed on medication. (Tr. 327-34). Later records showed a diagnosis of bipolar disorder and oppositional defiant disorder. His medications included Seroquel and Trileptal. An intake assessment from 2008 described him as having pervasive housing and employment challenges and limited social skills. (Tr. 380). At that time, an anxiety disorder was diagnosed, and individual counseling was recommended. His GAF was rated at 50. (Tr. 381).

In 2010, Plaintiff was again hospitalized due to suicidal ideation. The procedures performed included medication management, crisis stabilization, and finding appropriate housing. He agreed to follow through with medication following his discharge. He was discharged to the Timothy House for admission to their shelter. (Tr. 385-93).

The record contains some counseling notes from Tri-County. A note from May 23, 2012 shows diagnoses of major depressive disorder in partial remission and ADHD and a provisional diagnosis of schizotypal personality disorder. His GAF was rated at 55. (Tr. 422-23). A subsequent note made by his psychiatrist and dated in July, 2012 shows that Plaintiff was doing "pretty good" and that he had made some friends from playing video games. His "dark thoughts" had mostly resolved but he had gained some weight. He was continued on his medications. (Tr. 425).

The consultative mental status evaluation was done by Dr. Peterson, a psychologist. Plaintiff described a history of foster care placements and of having been in behavior classes from seventh through ninth grades. He had difficulty focusing on his schoolwork. As an adult, he had been jailed briefly for a misdemeanor assault. He denied ever having been fired, but did say that he had difficulties getting along with others due to his problems focusing. He had been receiving mental health treatment since age 12 and had a history of suicide attempts. Plaintiff

said he preferred to interact with others online instead of in person.  He appeared mildly anxious and reported several depressive episodes over the past six months.  He also reported "constant homicidal ideation."  Dr. Peterson diagnosed bipolar disorder and anxiety disorder as well as a history of ADHD.  She rated Plaintiff's GAF at 53 and concluded that he could perform simple and moderately complex tasks in a work setting without strict production requirements.  He would also do best in a setting without much interaction with people and where there was limited work stress.  She also indicated, on an attached form, a marked restriction in his ability to "[r]espond appropriately to usual work situations and to changes in a routine work setting." (Tr. 430-38).  A prior mental status evaluation, however, done in 2010 indicated that Plaintiff was "not a candidate for full time employment" due to his lack of a meaningful work history and the fact that he was not "emotionally ready" to work.  (Tr. 444-45).

### IV.  The Vocational Testimony

Karen White was the vocational expert in this case.  Her testimony begins at page 42 of the administrative record.

Ms. White first testified that Plaintiff's only past relevant work appeared to be as a fast food worker.  That job is unskilled light work.

Ms. White was then asked some questions about a hypothetical person of Plaintiff's age, education, and work experience who could work at all exertional levels and who could further learn, remember, and perform simple and detailed work tasks in a low-stress environment, defined as having no production pace, no strict time standards, no strict quota requirements, few workplace changes, and no over-the-shoulder supervision.  The person also could have occasional contact with supervisors and coworkers but minimal to no contact with the general public.  Ms. White said that such a person could probably do Plaintiff's past

-4-

work even though it had some pace requirements and could be employed as a garbage collector, farm worker, and groundskeeper. She gave numbers for those jobs in the regional and national economies.

Ms. White was next asked about someone who could perform only routine tasks involving simple work-related decisions, could tolerate only few workplace changes, could not interact with the public at all, could do no tandem tasks, and needed to work without fixed-rate production or pace. Such a person could, again, not do Plaintiff's past work, but could do jobs like laundry worker, housekeeper, and laundry bagger. Those jobs were consistent with only occasional supervision as well. Being off task for ten percent of the day would not preclude those jobs, but being off task for 20 percent of the time would be problematic. Frequent tardiness or absences from work were inconsistent with employment, however.

V.  The Administrative Law Judge's Decision

The Administrative Law Judge's decision appears at pages 12-22 of the administrative record. The important findings in that decision are as follows.

The Administrative Law Judge found, first, that Plaintiff had not engaged in substantial gainful activity since his application date of November 23, 2010. Going to the second step of the sequential evaluation process, the ALJ determined that Plaintiff had severe impairments including migraine headaches/cephalgia, major depressive disorder (in remission) /mood disorder, bipolar disorder, ADHD, PTSD, anxiety disorder, and schizotypal personality disorder (provisional). The ALJ also found that these impairments did not, at any time, meet or equal the requirements of any section of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1).

Moving to step four of the sequential evaluation process,

the ALJ found that Plaintiff had the residual functional capacity to perform work at all exertional levels but that he had to work in a low-stress environment without production pace, strict time standards, no strict quota requirements, few workplace changes, no over-the-shoulder supervision, minimal contact with the general public, and occasional contact with others in the workplace.

The ALJ next concluded that Plaintiff had no past relevant work.  However, the ALJ found that Plaintiff could do certain jobs identified by the vocational expert, including garbage collector, farm worker, and groundskeeper.  The ALJ further found that such jobs existed in significant numbers in the regional and national economies.  Consequently, the ALJ concluded that Plaintiff was not entitled to benefits.

      VI.   Plaintiff's Statement of Specific Errors

In his statement of specific errors, Plaintiff raises these issues: (1) the ALJ did not properly evaluate Dr. Peterson's report; and (2) the ALJ did not make an appropriate credibility determination.  These issues are evaluated under the following legal standard.

Standard of Review.  Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Company v. NLRB, 305 U.S. 197, 229 (1938)).  It is "'more than a mere scintilla.'" Id.  LeMaster v. Weinberger, 533 F.2d 337, 339 (6th Cir. 1976).  The Commissioner's findings of fact must be based upon the record as a whole. Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985); Houston v. Secretary, 736 F.2d 365, 366 (6th

Cir. 1984); Fraley v. Secretary, 733 F.2d 437, 439-440 (6th Cir. 1984).  In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" Beavers v. Secretary of Health, Education and Welfare, 577 F.2d 383, 387 (6th Cir. 1978) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)); Wages v. Secretary of Health and Human Services, 755 F.2d 495, 497 (6th Cir. 1985).  Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence.  Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983).

### A. Dr. Peterson's Report

As noted above, Dr. Peterson appeared to conclude in her report that Plaintiff could work, although with certain psychological restrictions.  The ALJ, in discussing that report, said that her opinions were entitled to "special weight" given the fact that she examined Plaintiff and has expertise in mental impairments.  However, the ALJ discounted the single marked limitation which Dr. Peterson noted, stating that it was "inconsistent with the evidence of record.  The claimant admits that he quit his last job as a fast food worker only because he was leaving the area, not due to psychological symptoms."  (Tr. 20).  The ALJ also stated, more generally, that his RFC finding was "supported by the unimpressive medical findings, the claimant's sporadic treatment history, [and] his own report of daily activities ...."  (Tr. 21).

Plaintiff argues, in support of his first claimed error, that the ALJ had no basis for rejecting the portions of Dr. Peterson's report with which the ALJ disagreed.  He contends that the ALJ misunderstood his housing arrangement, which led the ALJ to disregard, erroneously, Dr. Peterson's view that Plaintiff

could not live alone.  He then asserts that the ALJ should not have relied on Plaintiff's past work at McDonald's as evidence that he did not have a marked impairment in dealing with even usual work settings, noting that he earned only a little over a thousand dollars in six months, that he testified he was unable to stay focused at work, and that his supervisor would not recommend him for work at another McDonald's.  Based on the fact that Dr. Peterson's evaluation was the most significant opinion evidence on the issue of mental limitations, Plaintiff argues that the ALJ's decision to reject significant portions of it cannot stand.

     The Commissioner characterizes the issue as one where Plaintiff simply disagrees with the ALJ's decision, but where the ALJ resolved conflicts in the medical evidence based on sufficiently well-supported reasons.  The Commissioner's memorandum points out that Dr. Peterson herself made findings which are inconsistent with an inability to deal with even modest changes in work routines or ordinary work stress, and that there was also evidence supporting the conclusion that Plaintiff was able to live independently.

     It does not seem that the question of Plaintiff's ability to live independently factors into a residual functional capacity finding relating to the psychological requirements of work.  It may have an impact on socialization, but the ALJ found, consistent with Dr. Peterson's conclusions, that Plaintiff could not tolerate more than occasional interaction with coworkers and supervisors or more than minimal contact with the public, and Plaintiff does not contest these findings.  In any event, it is clear that the ALJ both understood that Plaintiff was living in semi-supervised housing (Tr. 20) and determined that Plaintiff had some level of independent living skills, such as being able to use public transportation and go to appointments

unaccompanied. Again, Plaintiff does not challenge the ALJ's citation to this evidence as being unsupported by the record. If the ALJ did commit any error in characterizing Plaintiff's ability to live independently, that error does not appear to have affected the critical issue in the case, which is whether Plaintiff has the mental capability to do the type of work which the ALJ found he could perform.

The more difficult issue is whether the ALJ had a substantial basis for rejecting Dr. Peterson's statement - made only on the form she completed, and not in her narrative report - that Plaintiff had a marked impairment is the ability to "[r]espond appropriately to usual work situations and to changes in a routine work setting." (Tr. 437). Certainly, there was evidence that Plaintiff had difficulties in his prior employment, but they were not necessarily difficulties in this area. His testimony suggested that he had problems with the pace of the work because his mind wandered, and not because the routine changed or because he was unable to respond appropriately to the usual work setting he was in. The ALJ was entitled to take that fact into account in determining that Dr. Peterson may have overstated Plaintiff's limitation in this area, and the ALJ was also entitled to consider the totality of Dr. Peterson's report, which states that Plaintiff "is expected to be able to respond appropriately in a work setting with limited stress." (Tr. 435). To the extent that a single medical report presents conflicting opinions, and ALJ may resolve that conflict in a way that a reasonable person would, and that is what occurred here. Cf. Curler v. Comm'r of Social Security, 561 Fed. Appx. 464, 471 (6th Cir. April 1, 2014)(holding that an ALJ was entitled to reject indications on a form as inconsistent with the source's own treatment notes). The Court therefore finds no merit in Plaintiff's first assignment of error.

###### B. The Credibility Determination

Plaintiff's other argument is that the ALJ did not properly assess his credibility. Citing to Social Security Ruling 96-7p, Plaintiff points out that there are seven factors, in addition to the objective medical evidence, which an ALJ must take into account in evaluating a claimant's credibility, and he contends that the ALJ was overly focused on the objective evidence and failed to cite to sufficient reasons for discounting Plaintiff's description of his limitations.

Plaintiff is correct that a social security ALJ is not permitted to reject allegations of disabling symptoms, including pain, solely because objective medical evidence is lacking. Rather, the ALJ must consider other evidence, including the claimant's daily activities, the duration, frequency, and intensity of the symptoms, precipitating and aggravating factors, medication (including side effects), treatment or therapy, and any other pertinent factors. 20 C.F.R. §404.1529(c)(3). Although the ALJ is given wide latitude to make determinations about a claimant's credibility, the ALJ is still required to provide an explanation of the reasons why a claimant is not considered to be entirely credible, and the Court may overturn the ALJ's credibility determination if the reasons given do not have substantial support in the record. See, e.g. Felisky v. Bowen, 35 F.3d 1027 (6th Cir. 1994).

Here, the ALJ provided the following rationale for discounting Plaintiff's testimony. The ALJ acknowledged "a long history of significant symptoms," but found that when Plaintiff was consistently taking medication and receiving treatment, he was stable. (Tr. 19). There are records to support this proposition, which are cited in the administrative decision. The ALJ also pointed to the fact that Plaintiff, although he said he could not concentrate, completed college-level work, and that he was able to use public transportation and go to appointments unaccompanied even though he lived in semi-supervised housing.

-10-

Id.  The ALJ also cited evidence of social skills such as Plaintiff's ability to live with a roommate, to play games on the internet, and to access social media sites.  Id.

The ALJ did not, as the record shows, focus only on the lack of objective verification of symptoms when reviewing Plaintiff's credibility.  She cited to various matters in the record, and Plaintiff neither argues that those factors are absent nor that the ALJ was not entitled to rely upon them in deciding the credibility issue.  He does assert that he did not successfully complete his college work, and that the ALJ incorrectly interpreted that part of the record, but there is no dispute that he attended college and expressed a desire to complete a degree.  The Court is required to be especially deferential to an ALJ's credibility finding when the ALJ considered the appropriate factors set forth in the applicable regulation - which happened here - and made a reasonable evaluation of the evidence.  See, e.g., Riley v. Comm'r of Social Security, 2013 WL 3467212, *8 n.6 (S.D. Ohio July 10, 2013)("Even if the ALJ's reliance on the challenged evidence was discounted, substantial evidence (that Plaintiff has not challenged) remains supporting the ALJ's credibility determinations. The Undersigned, therefore, declines to disturb the ALJ's credibility determination"), adopted and affirmed 2013 WL 4776736 (S.D. Ohio Sept. 6, 2013).  That is especially so when, as here, the ALJ credited many of Plaintiff's complaints about psychological limitations and found that he had a number of work-related constraints arising from his psychological impairments.  Consequently, Plaintiff's second claim of error also presents no basis for reversing or remanding this case.

## VII.  Recommended Decision

Based on the above discussion, it is recommended that the Plaintiff's statement of errors be overruled and that judgment be entered in favor of the Defendant Commissioner of Social

Security.

## VIII.  Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

/s/ Terence P. Kemp
United States Magistrate Judge